of our second and final case this morning, number 20-2554, Shorter v. United States of America et al., Ms. Popkin and Mr. Simpson, and Ms. Popkin, whenever you are ready. Yes, I can hear you. Okay. Ms. Popkin, whenever you're ready. Thank you, Your Honor, and may it please the court. Chrissy Shorter, a transgender woman. Do you wish to reserve any time for rebuttal? Oh, sorry about that. Two minutes would be wonderful. Thank you. That's great. Thank you. Thank you. Chrissy Shorter, a transgender woman housed at an all-male facility, filed this pro se complaint alleging that she was sexually assaulted and stabbed seven times after repeatedly warning defendants of her need for protection. Both Shorter and others informed defendants of her risk of harm in no uncertain terms. Can I just ask a question at the outset on claims? Your claim is primarily related to the Eighth Amendment. You're not arguing any longer the Fifth Amendment or the Federal Tort Claims Act claims, are you? No, that's correct, Your Honor. Okay. Thank you. Should I continue or? Oh, yeah. Go right ahead. Go right ahead. Thank you. Nevertheless, defendants repeatedly placed her in harm's way. They housed her with a sex offender. They isolated her in an unlocked cell where no guards could hear her cries for help. While Shorter stayed awake at night to guard her door, defendants waited weeks to sign and submit her transfer forms. If this doesn't state a claim at the screening stage, then nothing does. Nonetheless, the district court rejected her Eighth Amendment claim using an incorrect legal standard that Farmer v. Brennan explicitly rejects. Even defendants don't defend the district court. Yeah. The interesting thing is when you, the case that obviously helps you more than anything on the Supreme Court level perhaps is Farmer, and yet the Supreme Court in Ziegler in 2017 says that we have allowed Bivens claims in only three times, Bivens and two other cases, the two other cases are not Farmer. Then what helps you perhaps is that Bistrian, the Bistrian case decided by Judge Jordan in 2018 says that nonetheless, this is a Bivens claim, and it passes muster with respect to what went on in prison, and it passes muster because Farmer was a Bivens claim, even though Bivens I think is only mentioned once in the entire opinion and in the concurrences. So what are we left to expect happens here in connection with, does Farmer continue to exist or not as a Bivens claim? Yes, Your Honor. Farmer is certainly a Bivens claim, and this court is bound by its panel decision in Bistrian which holds as much, and defendants don't cite to any other post-Abbasi Supreme Court decision or en banc decision that would hold Bistrian into question. And as this court held in Bistrian, or described in Bistrian rather, Farmer was merely not distinct enough from Carlson in order to merit Abbasi delineating it from Carlson. Both are Eighth Amendment conditions of confinement, deliberate indifference claims. The district court didn't, I mean, it assumed that Farmer controlled, and yet was this really litigated below? Well, it was not litigated at all because it was a sua sponte decision, is that correct? Yeah. That's correct. Mm-hmm. That's correct. One question I have is whether Shorter stated an Eighth Amendment claim. Now, Shorter herself looks like she bore some responsibility for the delay. She amended her transfer request multiple times. That could have slowed down the process. She requested a transfer to a facility in Alabama in September. She revised the request to go to a high security prison in Mississippi. At the end of September, she amended a request to state she no longer believed the high security Mississippi facility was workable. Then they emphasized that she wanted to be in a facility close to her family. I mean, if you are the, and this is just part of it, if you're part of the administrative process here, you're sort of going, whoa, what does she want? Well, respectfully, I disagree with the questions as it was presented in the sense that the reasonableness inquiry of the deliberate indifference test is the defendant's burden and not the plaintiff's. So even the most challenging, I would say, of prisoners is still entitled to the protections of the Eighth Amendment. That said, there was much more that the defendants could have done aside from expediting her transfer. For example, as she states in her complaint, they could have moved her away from the isolated cell furthest from the guard's office to a cell that's much closer to the guard's office. They could have increased supervision of her and they could have placed a makeshift lockdown lock on the door. I know my friend on the other side points out that it is a fire hazard, but he did not state that the corrections officers couldn't have had a key and plenty of other facilities have locks on doors and it's not a problem in the BOP. So there were many other things that they could have done in the meantime while they were short of figuring out and sorting out her transfer request needs. But deliberate indifference is a very high bar. Is the test they could have done more? In terms of- And how were they deliberately indifferent? They actually went through and they acceded to her request, was moving forward, now maybe not with the speed she would have liked, but they did recognize the risk and they were going to transfer her. How do we say they were deliberately indifferent? Well, Shorter has alleged many instances in which defendants were unreasonable. Well, just to take a step back, the deliberate indifference test requires the defendants to have actual knowledge, which is what the court below determined they did not have using an incorrect standard. And then defendants can escape liability by acting reasonably and Shorter has sufficiently alleged that they have plausibly been unreasonable in a variety of ways. For example, 20 days passed between the first transfer request and the meeting with the Gender Dysphoria Committee and defendants say no reason why there was such a delay. She spent over three weeks in a cell with 11 men, despite the fact that they were well aware that she was transgender even before intake, as she alleged in her complaint. And there's no reasonable explanation as to why Warden Hollingsworth waited 17 days to submit her transfer form. And when he submitted the transfer form, he submitted the transfer form for another low security facility, which is precisely what puts her at risk because there are no locks on the doors of low security facilities. And less than a week before her assault, Associate Warden Hazelwood explicitly stated that there were inmate assaults happening, that there was an influx of hard contraband weapons, and there is nothing on that doesn't necessarily tie to a an assault on transgender. An attack like this, what knowledge was there on? I mean, she was in a cell with with men. The most that she could identify was that there were were comments made about nipples and things like that. But there were no attempts to assault her, were there? But prior to her actual assault, your honor, yes, yes. No, there there were no assaults, at least according to the record that she put forward in her pro se prisoner complaint. Were there any were there any threats alleged prior to the assault in October? There were comments made, but I don't know if there were any particular threats, but that's precisely the standard that Farmer rejects. And in fact, the plaintiff in Farmer Farmer herself didn't say anything prior to being assaulted. And the Supreme Court held that defendants had actual knowledge, even at a much later summary judgment posture. And here we have a pro se complaint where she has alleged actual knowledge on the basis that she told them repeatedly that as a transgender woman who was smaller in stature, who had a mental illness and who had previously assaulted, that she was at a substantially higher risk of being assaulted at a low security facility that was filled with sex offenders. So given the Supreme Court's reluctance, as it were, to push Bivens out any further, why shouldn't we defer to the government's argument that there were other ways to pursue this procedure and pursue an injunctive relief? Well, as this court is held twice over in Mac and in Bistrian, citing Abbasi for constitutional harms where physical injuries result from those constitutional violations, it's Bivens or nothing. It is monetary damages or nothing. And no other remedy could address her injuries aside from that. Defendants cite to the PLRA, which this court, as I stated in both Mac and in Bistrian, found it to be unavailing as an alternative remedial scheme for cases in which there was a failure to protect, which led to a prisoner assault. Are you one question? The Captain Pena and the compliance officer, the PRIA compliance officer, were dismissed. I'm looking at the when I looked at the complaint, I didn't see them containing any particular allegations about them. So wouldn't it be appropriate to dismiss them at the very least? I would I would say, your honor, that at least as it pertains to defendants, Byrd, Hamill, Dr. Moran's, Hollingsworth and Hazelwood, those cases or those claims should move forward against those defendants. If there are no pleadings that address those particular defendants that you mentioned, then perhaps those could be dismissed. But as for the one, two, three, four, five that I mentioned, those should move forward because she has specifically alleged that they had actual knowledge in her in her complaint. And I think that's for that. I think there are four defendants that aren't mentioned in the complaint. And I would look at that. OK. I just to circle back to to that question, though, as it pertains to the I know the defendants mentioned collective liability. According to this court's 2012 Bistrian decision, which was on a motion to dismiss posture, there was a lot of deference afforded to Bistrian as a pro se litigant that he when he had a claim against a lot of defendants in that case and this court allowed those claims to move forward and under and the court understood that Bistrian was not meant to be clairvoyant. I believe were the words that this court used to not know necessarily what was happening behind closed doors and which defendants had actual knowledge and not at such an early stage in the litigation. And here we're at an even earlier stage, a 1915 screening order. So I would I would would I would I would submit that the court should include all defendants at this stage and that the proper vehicle to determine whether or not defendants had actual knowledge is in discovery. All right. Could you address the I think you suggested that we not reach qualified immunity, but if you could address why you make that. That take that position as a procedural matter, qualified immunity is disfavored at a motion to dismiss posture in general, and I know that this isn't a motion to dismiss posture. It's a 1915 screening order, which is even prior to a motion to dismiss. But defendants can only satisfy that burden if it is conclusive on the face of the pro se complaint that Shorter had failed to allege a clearly established constitutional violation. And as this court held in Thomas, that is not a requirement. Shorter is is not required to allege a constitutional or a clearly established constitutional violation at the pleading stage. But nevertheless, she has done so. She established a clearly established right here was established in Farmer in 1994 and in this circuit in Hamilton in 1997. And and she has satisfied that burden easily with respect to the fact that defendants had actual knowledge to satisfy the subjective component of the deliberate indifference test and defendants acted in an unreasonable manner and they cannot escape liability. So I would say that there is no need to address the qualified immunity aspect at this stage because the court has a clear path for reversal on the basis of the fact that the district court erred in applying the incorrect standard under Farmer and it doesn't need to address qualified immunity at such an early stage. All right. Thank you. Do my colleagues have any further questions before we go to Mr. All right, we'll get you back on rebuttal. Thank you, Your Honor. Mr. Simpson. Good afternoon. May it please the court. I hope you all can hear me. My name is John. Yes. Good. You're coming through loud and clear. Terrific. I'm an assistant U.S. defendant's to the Eighth Amendment Bivens claim in this matter. All of the issues in this constitutional tort case turn on a congressional enactment, the Prison Rape Elimination Act, and on legal considerations that relate to that law and its implementing regulations. We're asking the court to affirm. Now, we have to begin by the problem in terms of the obviously the availability of a Bivens remedy is is one of those things. It has to be very narrow, cannot be a new context, for example. But, you know, it looks like much of your briefs is an attempt to have us go back and I don't I won't say we litigate, but review again Bistrian. But we're bound by that case. And it says that Farmer is still good law in the Bivens context. And Farmer established that a transgender plaintiff can bring a Bivens failure to protect claim under the Eighth Amendment after being sexually assaulted. And how do I tell me how that isn't factually indistinguishable from this case? Judge Ambrose, the lodestar under the Abbasi case is, as you mentioned, whether there's a new context. And our view is that whether you're looking at Farmer or you're looking at Bistrian, the key thing that distinguishes this case from those cases is the enactment of PREA and the advent of the PREA regulations that were promulgated in 2012. The Abbasi court made very clear that one of the things that can constitute a change of context, a new context, is a new statutory or regulatory context that governs the officials who are involved, the defendants. That almost unquestionably is involved here. Does PREA offer the same meaning? PREA is different. You know, you're making PREA sound like the Prison Litigation Reform Act. It isn't. What PREA does is almost heightens the urgency and the necessity for the prison officials to be trained in this area and says, we mean this. This is serious stuff. I don't know how PREA really helps you. It's not something that is supposed to streamline remedies in any way, shape or form. Doesn't PREA actually raise the level of, you know, of what the prison officials are required to do vis-a-vis these people? Well, let me just ask, if I could just add some support to what Judge Rendell just said, PREA favorably cites Farmer in its preamble. Well, so I would agree with both Judge Ambrose and Judge Rendell that PREA makes clear that this is a serious issue. Congress looked at the Farmer decision and obviously looked at a lot of other things and said something needs to be done about this. And so they passed a law and charged an independent commission with doing extensive study and then further charged the attorney general with creating a regulatory scheme. What I think I think that the position that was just articulated by both judges is not incompatible with our position. The fact is, though, that Congress said we want a remedial scheme here to give guidance to prison officials, to create expectations and to move forward on trying to address what has been a serious problem and an ignored problem. But if we look at the purposes of the statute and the findings of the statute, they also make clear that the job here that Congress is trying to accomplish is twofold. First and foremost, obviously, to deal with to set the zero tolerance standard and to address previously unaddressed Eighth Amendment violations and to give guidance on how to do it. But part two, and it's in both 30301 and 30302 of the statute, is to reduce the overall economic costs for all jurisdictions of these of these kinds of assaults. If I could back up a minute, we don't get to PREA, do we? If we decide this is not a new context, PREA is one of those things that would counsel us against creating. If you say it is a new context, if we say this is not a new context, we're there under Farmer and Bistrian. We don't even get to consider PREA, do we? Well, Your Honor, I'd have to agree. If you say this isn't a new context, our position is that PREA, along with the other special factors considerations, push this into a new context and that this court should say, look, we understand that Farmer exists. We understand that Bistrian exists. But PREA did not apply to either one of those cases. So according to Abbasi and what the Supreme Court said, we have a new context and we have to ask the question of whether a money damages remedy is appropriate. Well, as Judge Ambrose points out, Farmer is mentioned in PREA, so it's almost pursuant to rather than creating a new context. And I thought your argument was that PREA deliberately excluded a monetary damages remedy from the statute. Therefore, it would support that perhaps Bivens doesn't apply in that case. But the counter to that, the antidote is that PREA favorably cites Farmer and really goes back to Judge Rendell's question is we've got you've got Farmer. It hasn't been overruled by the Supreme Court. It may only have mentioned Bivens once, but it was clearly a Bivens case with respect to an assault in prison. And the Supreme Court said that it goes back because of the way it dealt with deliberate indifference. And then you got Bistrian saying, well, Farmer wasn't specifically mentioned in the Ziegler case of the Supreme Court. It's on all fours with what Farmer was about. And if it's not on all fours, it's close. This case appears to be all fours. Well, so, Your Honor, I would point out again that the Farmer case did not find a money damages remedy. And there were two things at issue in the Farmer case. First was whether she could pursue I'm sorry. Let me let me correct. But it's clear that the Bivens action could go forward in Farmer. Well, I think that the Supreme Court clarified what the elements of an Eighth Amendment deliberate indifference claim was. And there was a remand to find out whether the claim that Ms. Farmer brought that Farmer brought qualified under that standard and would allow her to proceed on either a money damages remedy or the injunctive relief that she wanted to seek. So there was no discussion. In fact, the Supreme Court in Farmer discusses injunctive relief in this context much more frequently than than the money damages. And we would also we'd obviously take issue with the other side who said that there was essentially a kind of a finding of Eighth Amendment liability in Farmer. There wasn't. The Supreme Court set out the standard and remanded it back to the lower courts to determine whether there had been an Eighth Amendment violation. But at the end of the day, at the end of the day, you can't pursue money damages in a preempt, but you can under the Eighth Amendment, correct? Correct. But I would also add, Judge Restrepo, that this is one of the key differences in this case, as opposed to Bistrian. This court found in Bistrian in twenty eighteen that Mr. Bistrian had no other recourse but money damages, not so from his shorter. The PREA regulatory scheme provides recourse to inmates at various different levels and includes the ability to lodge complaints and essentially initiate investigations. Sure, but it doesn't doesn't provide for damages. Well, but your honor, I think that it is more comprehensive in that. So a Bivens remedy is only available for extreme violations, a constitutional violation. The PREA scheme that Congress set up and sort of charged the attorney general with populating would allow an inmate like Ms. Shorter to complain about mere negligence by a prison official, initiate an investigation and appropriate punishments would be meted out for a violation right up to the point where you have an official who does something that is a constitutional violation. And that's what that's what she's claiming she is now. So, yeah, it would allow inmates to pursue minor or less maybe complaints that don't rise to a constitutional level. But it doesn't preclude her from pursuing this claim, correct? Well, your honor, we have we have a sort of a statutory dispute on that. Their view is that because the PREA statute does not exclude a monetary damages remedy, that it doesn't preclude a Bivens remedy. Our view is that because in 30301 and 30302, Congress talked extensively about the economic costs of the failure to deal with sexual abuse in prisons, that that suggests that allowing a sort of an add on or allowing the judicially made remedy for monetary damages on top of the remedies that are already available through the statute and the regulatory scheme, that that's inconsistent and that Congress, in fact, wanted to not burden the federal government as the Supreme Court talked about in Abbasi. The costs of Bivens litigation to the federal government are enormous. But what is the point here is the point here, the injuries to the individual. And that's what when they said Bivens, you know, it's got to be Bivens or nothing in the context of Bistri and where somebody's either assaulted and they're hurt, they could be hospitalized and have, you know, four hundred thousand dollars worth of damages. And and here she's stabbed several times. It's Bivens or nothing. Nothing's going to compensate her for for injury. I just don't see the difference here. Well, so, your honor, I think that the purpose of a Bivens remedy in large measure is to reduce the cost of providing constitutional violations. And our argument would be that that the the punishment scheme, the sanction scheme under the prayer regulations provides for that. Again, it's not to compensate the plaintiff for harm. Well, there would. I think that's a component of it. But I think deterrence is an equal component. And the prayer regulations provide a way to deter officials from that sounds like an injunction. We're talking about a harm in the past. And the only thing that can compensate are money damages. And one of the biggest concerns I have here is how in the world do you make that this decision at the screening stage of 1915? Well, your honor, we think that that's governed by the Ashcroft versus Iqbal decision that sets forth sort of the menu. You're saying that there is no plausible claim to an Eighth Amendment violation made by Mishorder. Correct. We are saying that while there there's certainly a measure of risk in there, there was a finding by the folks at FCI for Dix that she faced increased risk because of her transgender status. But the the farmer standard is objectively intolerable risk that is known by by don't you need discovery to get there? Well, not on this pleading, your honor. I mean, to Miss Shorter's credit, her pleading is detailed. It's fact rich. And she attaches numerous documents that show what she did and what each of these defendants. So what's missing? What what's missing? What should she have included to satisfy your matrix? Well, so, your honor, I don't think that I think the fact is that she included quite a lot. So what's what's missing? What would have survived? Well, so I would say that what is missing is that the facts taken together after you take them through the Iqbal process of sort of winnowing out and just looking at the facts as pleaded, there is not an objectively intolerable risk. That's one. And secondly, I think that the actions of these defendants, I'm not going to claim they were perfect, but they were reasonable. I think they were reasonable. And they're set forth in the actions that they took in response to her conditions there, her requests there were reasonable on the face of the complaint. And therefore, we don't rise to the level of reasonable on the face of the complaint. Yes. I mean, reasonableness is not something that's judged on the face of the complaint, is it? And I don't know that objectively intolerable is the is the case. It's it's deliberate. It's knowledge, deliberate indifference. Well, your honor, in Farmer, it's described as a as an excessive risk or an objectively intolerable risk. This court in Beers Capital actually referred to the risk level as objectively intolerable, quoting Farmer. Well, and doesn't Priya actually bolster the fact that this kind of situation presents that kind of risk? Well, I think your honor, again, I think part of the problem with this case is that if we start to link the prior regulations to a constitutional standard, we get away from the essentially instruct and guide prisons on how to how to deal with what has been a problem for decades. It's gone completely unaddressed. If we start to say, well, we're going to we're going to put a constitutional liability on top of the requirement that an inmate be screened within 72 hours of arriving at a facility, we we get away from trying to balance safety and relative liberty within a two year time frame, well. So my question is, what does the witness process look like? When you say that you preserve the ok… We restrict the vision of the prisoners.  So we restrict safety of the person. By the defendants in that particular case. And then an assault or some type of harm happened. Your Honor, I would revise that and say that it has to be, again, I think your description of the risk is correct. I don't think that it's a should have had knowledge. I think it's an actual knowledge standard. But looking at, let's see what page it is, looks like 838. But an official's failure to alleviate a significant risk he should have perceived, but did not, cannot, you're right, you're right. Cannot be condemned as an infliction of punishment. I think that's right, your Honor. I think that's why there is the actual subjective knowledge standard. I think the only distinguishing factor on that one is that the Supreme Court says that if the risk is so patently obvious… Yeah, the page before. The official knows of and disregards an excessive risk to inmate health or safety. The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists. And he must also draw that inference. In other words, you have to show that subjectively the person knew about it. And then the harm obviously has to have happened. Your Honor, if I may. If I can ask, didn't the district court apply the wrong standard here? The district court said there were no specific threats against her. So this is like Fletcher and Cole. So, you know, she's out of court. Isn't that the wrong standard? Well, it may be the wrong wording, Honor. And I hope you're not, you don't think I'm being too… Well, that's what happens. We have opinions that have words. And if words are wrong, it's the wrong standard. Fair enough, Your Honor. My view is that, again, the process that's set out in Iqbal is to look at the complete factual pleadings and to sort of discard conclusory material and then to weigh them against the standard. I think that it seems pretty clear to me in the opinion that Judge Bum did not perceive what this court, I think in Beer's capital, said was an objectively intolerable risk that was known by each individual defendant and for which they took no reasonable action. I think that Judge Bum said we haven't, the facts don't reach that. It's an awfully hard theme to push here that this was not a plausible claim when you note that there was a very detailed complaint. Well, Judge Ambrose, let me, if I may, I'd actually like to point to something in the reply brief, because I think that Ms. Ambrose actually focused the case pretty usefully for us. On page five of the reply, she says that she was sexually and physically assaulted by an assailant, and I'm quoting now, who did not provide her with any forewarning of his intention to attack her, and the next sentence says that she did not receive any specific threat from an individual prisoner, but was more generally threatened by the overall physically violent culture of the That's at the bottom of page five. Now, I think that the Bistrian decision in 2012 draws a hard line between these things. If you recall that opinion, Mr. Bistrian had sued federal officials in Philadelphia, sort of under two separate. I'm awfully familiar with. I'm sure you're very familiar with it, Judge. The first bucket of course, was the attack. He was attacked by a prisoner who was known to be violent and known to have serious mental health issues. But there was no forewarning there, and there was no threat that had been made by that person. Those claims went away. The group that stuck around, of course, were the threats that were made by the gang who Mr. Bistrian had informed on, that everyone knew intended to harm him, and officials put him in a locked yard with members of that gang, and they viciously beat him. So that line, we think that this case, when you look at all the facts, there is risk here, the same way there was risk in that first bucket, that first beating that Mr. Bistrian took. There was risk here to Ms. Shorter, but we think that it's in that first bucket. There was no specific threat. There was no forewarning. There was risk, of course, because as they say in Farmer, there is risk in these prisons, but it did not get up to the constitutional level. I think I'm over time, but I'm happy to talk. How do you decide that in a screening stage? Well, again, Your Honor, I think by looking at the vermin in the complaint and sorting out all the factual allegations and asking whether they reach the level that's set forth in Farmer, I think the difficulty in this case is that if we just assume that a place like FCI Fort Dix is inherently and constitutionally risky to an informant or an inmate like Ms. Shorter, who's transgender, there is no differentiating between a constitutional violation and the inherent risk that exists in these facilities. And we think that Judge Baum looked at the facts as pleaded and applied the standard and came to the right result on the Eighth Amendment claim. You argue that the take in connection with Pena and the compliance officer for Priya, you argue that the. Complaints were too generalized, but I couldn't find any case law that says that a prisoner must specifically identify who she believes will harm her in order to establish a deliberate indifference claim. It doesn't just Farmer and I guess our case in Hamilton say just the opposite. Right. Well, and Your Honor, Hamilton's an interesting example because I think there we have a DOC panel that decided unanimously that Mr. Hamilton needed to be placed into protective custody. He had been in protective custody on and off for years, had been attacked on here. I think it's distinguishable because no one at FCI Fort Dix, while they while they did acknowledge that there was an increased risk level from his shorter, no one said unequivocally she needs to be placed into protective custody. And on the record, as she put it together in her amended complaint, she attached records where she made clear that she did not want to be placed into protective custody. So we have an inmate who's looking at the conditions at Fort Dix and saying, I don't like it here. I'm uncomfortable. I feel at some risk here, but I don't want to be placed in the shoe. And you have officials who who agree with that and say, well, look, we're going to we're going to try to meet your accommodations for housing. We will get you transferred out, but we don't we're not going to force you into protective custody at this point because you don't want it and we don't see a risk level that's that high. I think that's very distinguishable from Hamilton. All right. Any further questions of my colleagues? No. All right. Thank you. Let's hear back from Ms. Popkin. Can you hear me? Yes, we can. Right. So I want to first respond, at least to the PRIA arguments that my friend on the other side made. The purpose of PRIA, the Prison Rape Elimination Act, is not to save the government money. It's to prevent sexual assault, which is legion in the United States. It's important to note that if this court were to hold for defendants, then there would be an availability for state prisoners, which is where in in state prison, which is where the vast majority of prisoners are confined. There would be a remedy available for monetary damages under 1983. But federal prisoners would no longer have the ability to hold their prison officials accountable for establishing a risk that would lead to their sexual assaults in federal prison. And that doesn't make sense because the Prison Rape Elimination Act, as we state in our reply brief from pages nine to 12, explicitly allows for constitutional liability to continue. So PRIA regulations were meant to supplement rather than supplant the federal prison law, which was already available under 1983 and Bivens. And as for the discussion about Bistrian, I would say that the touchstone of the inquiry is whether or not defendants had actual knowledge. And here they did. They themselves admitted that the place was too risky, in my friend's on the other side's And they explicitly stated it in her transfer request forms that the place could not provide her with adequate supervision and that she was at risk for sexual assault as a transgender woman at this facility. So I would say that the the actual knowledge component was satisfied here. And Shorter need not have entered custody or sorry, solitary confinement involuntarily because the PRIA standards explicitly state that that is not that is like the intervention of last resort, that the defendants or prison officials should do everything else in their power prior to putting them in such punitive isolation for the mere reason that they are at risk of sexual assault. So the PRIA regulations explicitly state that. I don't know if the court has any other further questions for me. No, my colleagues, any any further questions, nothing for me. No, I would ask if there could be a transcript prepared of this oral argument. And I would ask, would the government be willing to pick up the cost for that, Mr. Stinson? Your Honor, I won't I won't say no. Everyone asked the question, but yes, we will pick up the cost for that. All right. Thank you. It shouldn't be that much. I want to thank both of you really very, very well presented arguments. You you do yourselves very well in terms of hand yourselves very well in terms of both the briefing and the oral argument. And it's a privilege to have both of you with us today.